No. 3--09--0686

Opinion filed March 29, 2011

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

A.D., 2011

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No.  08--CF--1090 |
| STEPHEN CHROMIK, | ) ) | Honorable James E. Shadid, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Lytton and McDade concurred in the judgment and opinion.

**OPINION**

The State charged defendant, Stephen Chromik, with one count of criminal sexual assault (720 ILCS 5/12-13(a)(4) (West 2008)) and one count of aggravated criminal sexual abuse (720 ILCS 5/12-16(d)(West 2008)) for conduct that occurred with a minor, K.B. The case proceeded to jury trial in the circuit court of Peoria County.  The jury acquitted defendant of the criminal sexual

assault charge but convicted him of aggravated criminal sexual abuse.  This is defendant's direct appeal from that conviction in which he claims the evidence adduced at trial was insufficient to convict him beyond a reasonable doubt, the trial court impermissibly infringed on his right to confront witnesses and remain silent, the trial court erroneously admitted both prior bad acts evidence and a document containing text messages, and his sentence is improper.

FACTS

The bill of indictment charged that defendant committed criminal sexual assault in that on or about May 9, 2008, to June 1, 2008, he knowingly performed an act of sexual penetration with the victim, a person over 13 years of age but under 17 years of age, while standing in a position of trust, authority or supervision to the victim.  It further charged that during that same time frame, defendant committed aggravated criminal sexual abuse by knowingly committing an act of sexual conduct with the victim for the sexual arousal or gratification of the defendant or victim, who was at least 13 years of age but under 17 years of age when the act was committed and the defendant was at least five years older than her.

At trial, the victim, K.B., testified that her date of birth is September 25, 1991, and she attended Metamora Township High School during the 2007-08 school year.  She played on the varsity

2

soccer team in the spring of 2008, a time when she was 16 years of age. Defendant was her instructor in home economics for each semester of the 2007-08 school year and was also the assistant varsity soccer coach. She considered defendant to be unfriendly to her in the fall of 2007. His unfriendly conduct continued through the spring semester of 2008.

K.B. noted that on May 1, 2008, prior to a soccer game, she went to a shed where her team kept soccer equipment to gather it for their game. She walked to the shed with defendant, began gathering equipment for the game, and discussed the team meal with defendant. While in the shed, defendant asked K.B. "what [she] was good at." She inquired as to what defendant was talking about when defendant told her to "come here." After she walked over to him, defendant grabbed her by the belt, pulled her toward him, and put his hands up her shirt. His hands were under her shirt near her ribs before she "pushed his hands down."

K.B. continued by noting that after she pushed defendant's hands down, he put them back on her belt loop "before he started putting them down my pants." His hands made it "several inches [down] before" she "pulled his hands out." The victim noted that immediately after this incident she "was really scared, intimidated." Nevertheless, she asked defendant to help her carry equipment from the shed. She did not report the incident that day. She went to the soccer game. Later that evening, she told her friend A.H. about the incident. A.H. did not testify at

3

trial.

K.B. also testified that one week later, on May 9, 2008, her soccer team played their biggest rival and lost the match. Despite having plans to go to the house of a friend, she went home instead and received a call from defendant. Defendant asked her to meet him that evening at a gas station. She did, but while at the station neither exited their vehicles. Per his instructions, she followed defendant to his apartment in Peoria.

The victim noted that when they arrived at defendant's apartment, they watched the highlights of the soccer game on television. After that, defendant took out a deck of cards, two fifths of alcohol, and two shot glasses so they could play a drinking game. Over the next 30 minutes, she consumed five shots of vodka with the defendant. Defendant then began kissing her. He took off her pants and underpants and touched her vagina, legs, stomach and "all over the rest of [her] body." The next thing K.B. remembers is waking up between 6 and 7 a.m. the next morning to the sound of defendant's alarm clock. When she awoke, she was naked and defendant was asleep next to her also naked.

At trial, K.B. did not recall whether she had intercourse with defendant that night. She understood the meaning of intercourse and had "had sex" before that night. However, she did not remember having a feeling or indication that she had engaged in sex with defendant that night. She saw no blood, semen or dried fluids on the bed. When she awoke, she did not

4

shower, but put on her clothes from the night before and went to her car to retrieve running clothes as she was scheduled to run in the Race for the Cure that morning.

K.B. indicated she changed into her running clothes in defendant's apartment. She felt sick to her stomach, but ran the three-mile race anyway. She and defendant drove to the race in their own vehicles and, when she approached the spot where contestants were to park and gather, she veered off to take a slightly different route than defendant so the two would not arrive at the same time. She ran the 5-kilometer race in approximately 24 minutes, besting 12 of the 15 other girls from her soccer team that also ran in the race.

The victim continued her testimony by noting that defendant's behavior toward her at school did not change after the night in his apartment. He was still mean to her and she still feared and was intimidated by him. He asked her several times to get together, which she did not like. K.B. told her friends A.H. and L.H. about the situation with defendant.

K.B. testified that she spent a second night at defendant's apartment approximately a week or two after the first night. She could not recall the specific date, but knew it was an evening she was working in a restaurant and had been released early. Defendant asked her to come to his apartment that evening to create going-away presents for departing senior soccer players. K.B. stated she went to defendant's apartment under compulsion of

her fear of him. She believed, in advance, that there would be alcohol and sexual advances. Upon her arrival, defendant had a large drink with strong alcoholic content mixed for her. Intimidation led her to drink the cup as she was told.

The victim noted that after she helped defendant create "senior pages," he began kissing and touching her. Defendant removed her clothing and the two had intercourse. While she had partial memory loss from the alcoholic consumption, she specifically remembered having intercourse with defendant the second time she was at his apartment.

K.B. continued her testimony, indicating that following the second evening, defendant treated her the same way he always had. He was mean to her and she still felt threatened and intimidated by him. Then, in early June of 2008 while at a graduation party, she discussed the events that took place in the equipment shed with a graduating senior. The graduating senior then reported the situation to the school administration, which triggered an investigation.

The victim testified that she is familiar with defendant's telephone number as he sent it to her via Facebook. She exchanged a number of text messages with defendant. She presented a number, but not all, of these messages to the administration at Metamora Township High School. In the principal's office, with the principal and superintendent present, K.B. read text messages she received from defendant. As she read the messages, the

6

principal typed their content into a computer. It appeared to her that the principal accurately typed what she read to him. She read each message to him, including the date and time each message was sent. Once finished, the principal printed out the document, she read it, and signed it. She did not save and dictate every message received from defendant and she deleted all the messages she sent him.

K.B. identified photographic exhibits as pictures taken of defendant's apartment. She remembered defendant's bed was smaller than a queen and that it had green sheets. K.B. described the layout of defendant's apartment and noted he owned a couch with one arm missing. She noted defendant had an alarm clock in his bedroom and she could see at night by the light of the bright alarm clock. Clothing was piled up in bunches on the floor.

Finally, K.B. admitted her trial testimony differed from her statement given when interviewed by police in July of 2008 and from her testimony given to the grand jury. Before the grand jury, K.B. testified that she had sexual intercourse with defendant on two separate occasions; at trial she could not recall whether she had intercourse the first night she stayed at defendant's apartment.

Gregory Christy testified that he has been the principal of Metamora Township High School for the past 21 years. Defendant taught and coached there in the 2007-08 school year. One day, a

7

guidance counselor came to Christy regarding allegations raised by some of the victim's friends. A June 3, 2008, meeting took place in which K.B. discussed the allegations. This meeting, the first to Christy's knowledge, involving the victim and school officials, was attended by the two senior students, the guidance counselor, K.B. and Christy. Christy and the superintendent then met with K.B. and her mother and father two days later.

Christy acknowledged that he is a mandated reporter under the Abused and Neglected Child Reporting Act (325 ILCS 5/1 *et seq.* (West 2008)) and that, as such, he has a duty to immediately notify the police or the Department of Children and Family Services (DCFS) if "something has occurred." He did not report this incident. The superintendent ultimately reported the incident, but Christy did not know on what date the reporting occurred.

Christy also met with defendant and the superintendent at defendant's request on June 3, 2008. Christy asked defendant if any calls or communication had taken place between defendant and the victim. Defendant told Christy that there had been communication between the two but only regarding soccer scheduling.

The principal concluded his testimony by discussing the document he created that cataloged the text messages from defendant. His testimony mirrored the victim's in that he recalled she read the messages to him while viewing her phone,

8

and he transcribed what she read.  He acknowledged that his spell-checking function on the word processing program being used had changed some of the spellings of what he typed.  He could not identify which messages on the document were affected by that spell-check and which were not.  Neither he nor the superintendent compared the document to the messages on K.B.'s phone.  K.B. did compare the document to the messages and he relied on her truthfulness for that purpose.

Kenneth Maurer testified that he is the superintendent of the Metamora Township School District.  He met with defendant and the victim concerning this matter.  Defendant told Maurer that he spent approximately 10 to 15 minutes in the shed with K.B. which violated one of his own rules in that he was alone with a student for too long.  He informed Maurer that nothing inappropriate occurred and the two merely bantered back and forth.  Maurer identified photocopies of text messages sent from the victim to defendant after the victim had been instructed not to have any contact with defendant.

Maurer noted in his testimony that he did not report any activity to either the police or DCFS for more than 30 days after first hearing of the incident in the shed, even though he is a mandated reporter pursuant to statute.  He stated his reporting duties are triggered if "we have evidence of sexual relationship between an adult or a staff member with a child."  When asked if "an allegation that a teacher has attempted to place his hands up

9

her shirt and his hands in her pants" would "trigger an immediate report to DCFS," Maurer replied, "It would if she was consistent in that allegation. She wasn't."

Detective David Nelson testified that he is a juvenile investigator employed by the Peoria police department. DCFS notified him that it was initiating an investigation into contact between K.B. and defendant. During his interview with defendant, defendant admitted to contacting K.B. by phone and texting. Defendant informed Nelson that he did not touch K.B. in the shed at Metamora Township High School.

Detective Nelson indicated he obtained defendant's cell phone records from Sprint. The records indicate that from May 3, 2008, to July 8, 2008, exactly 386 calls and text messages were sent between the parties. Defendant initiated contact, via phone call or text message, with K.B. 180 times and K.B. initiated contact with defendant 186 times. On May 9, 2008, the day of the soccer match with Notre Dame, there were eight contacts between the two. On May 10, 2008, there were 18 contacts. The highest volume of daily calls occurred on June 3, 2008, the date the victim first met with the principal and superintendent. Ninety-six contacts took place that day with the defendant initiating 60 of those contacts and K.B. the other 36. Nelson noted that he compared the document created by principal Christy to defendant's cell phone records and the dates and times of the text messages Christy cataloged matched Sprint's records for outgoing text

10

messages from defendant's phone.

Detective Nelson testified that the Peoria police department employs personnel that could have conducted a forensic analysis of K.B.'s or defendant's cellular telephone in an attempt to retrieve deleted messages. That was not done in this investigation even though he knew messages had been deleted.

Defendant testified on his own behalf. He denied that he ever had inappropriate contact with K.B. in the equipment shed. He indicated the shed is not in a secluded area of the school but instead near the track where people could see into it throughout the day. He never had sex with K.B. and she has never been in his apartment.

Defendant reviewed the text messages that K.B. read to the principal and disagreed with the testimony of K.B. as to what they meant. He admitted that he sent text messages that read:

"Some fake crying would help, just say you made it up and you don't want to talk about it anymore. You have to say nothing happened because they think something did."

"Mr. C is tricky and gay."

"Don't let him and your dad pressure you again."

"I know you don't want to lie, but Mr. C is almost making you because he's dumb."

"I got a call from the school this morning

11

but didn't answer it or call back." Defendant claimed his only intent in sending messages to K.B. was to encourage truthfulness. He noted the unsaved text messages between the two discussed K.B.'s fear of being disciplined after becoming drunk at a party with a senior soccer player.

Defendant noted that his apartment experienced flooding throughout the month of May of 2008, leaving the carpets wet and an overpowering smell within the apartment. He discussed this problem with his apartment manager, Tonya Brewer, and maintenance worker Allen Adcock. He would frequently leave the drapes and windows open in his garden-level apartment and noted that everything K.B. described about his apartment could be seen from the outside by looking through the windows. He never owned a brightly lit alarm clock and uses the alarm on his cellular telephone to wake up. He owned navy blue sheets and never owned green sheets. He never had clothing bunched up anywhere on the floor in May of 2008 as he had a metal clothing stand in his bedroom for it. He neither owned shot glasses nor had any hard liquor in his apartment.

Defendant continued by indicating that in May of 2008, he executed a contract for the purchase of a home and was in a long-term, serious relationship with a girlfriend. He had purchased a new car and was committed to staying employed in the area.

On cross-examination, defendant admitted that at the time of the incidents, he had none of the other girl soccer players'

12

telephone numbers and K.B. was the only one he ever called.

Tonya Brewer testified that she is the resident manager of the apartments where defendant lived in May of 2008. A Web site contained a layout of a typical apartment floor plan for the complex. Defendant's apartment is located on the lower level and had continual maintenance problems, including backup and overflow of the garbage disposal. An underground leak adjacent to the building caused continual soaking of defendant's apartment. The flooding became so bad that she requested permission to move defendant to another apartment, but was denied by her supervisor. Throughout the month of May of 2008, a foul odor emanated from defendant's apartment.

Allen Adcock testified that he was a maintenance employee at the time defendant lived in the apartment building. He performed maintenance work on defendant's apartment several times and was in it two or three times per week during the month of May of 2008. One could not walk from the bedroom to the bathroom without getting wet as the carpet was continually soaked.

Stephanie Ramsey testified that she dated defendant for 2½ years from December of 2005 to July of 2008. At one time, they planned to marry. She visited defendant's apartment throughout the month of May of 2008 and described the water leak and bad odor. In May of 2008, Ramsey and defendant celebrated a dating anniversary on the day of the Race for the Cure, attended a wedding, attended commencement at Bradley University,

13

participated in a marathon in Rockford, Illinois, and celebrated Mother's Day with her parents. She had access to defendant's apartment via her own key and would routinely let herself in when he was not there, as well as visit him unannounced. His apartment had blue and green accessories in his bathroom, including a shower curtain that had been cut too short. He did not have an alarm clock. His sheets were navy blue, and to her knowledge, he had no shot glasses in the apartment.

Defendant rested following Ramsey's testimony. Ultimately, the jury returned a verdict of guilty as to the crime of aggravated criminal sexual abuse and acquitted defendant of the crime of criminal sexual assault. This is defendant's direct appeal from his conviction for aggravated criminal sexual abuse.

ANALYSIS

Defendant raises eight issues on appeal: (1) whether the evidence adduced at trial was sufficient to prove him guilty beyond a reasonable doubt; (2) whether he was denied his right to confront and cross-examine witnesses against him when the court ruled that he could not cross-examine the victim on the issue of her prior sexual conduct; (3) whether his right to remain silent was violated when the prosecutor remarked that the "defendant can testify what his version of events are"; (4) whether the trial court improperly admitted evidence of prior bad acts regarding the incident in the shed at Metamora Township High School; (5) whether the trial court erred in refusing to give a limiting

14

instruction regarding uncharged conduct; (6) whether the trial court improperly admitted the document that cataloged the text messages; (7) whether cumulative error deprived defendant of a fair trial; and (8) whether the trial court committed error in finding his Tennessee aggravated assault conviction mandated a Class 2 felony sentence even though his conviction for aggravated sexual abuse conviction is a Class 3 felony.

A. Sufficiency of the Evidence

When reviewing a challenge to the sufficiency of the evidence, we consider, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237 (1985). It is the trier of fact's responsibility, not ours, to resolve any conflicts in the testimony, weigh the evidence, and draw all reasonable inferences from it. *People v. Howery*, 178 Ill. 2d 1 (1997).

To convict defendant of the offense of aggravated criminal sexual abuse (720 ILCS 5/12-16(d) (West 2008)) as charged, the State needed to prove that K.B. was at least 13 years of age but under 17 years of age, that defendant was at least 5 years older than her, and that he committed an act of sexual conduct with her. 720 ILCS 5/12-16(d) (West 2008). The term "sexual conduct" means any intentional or knowing touching or fondling by the accused, either directly or through clothing, of the sex organ,

15

anus or breast of the victim for the purpose of sexual gratification or arousal of the victim or the accused. Illinois Pattern Jury Instructions. Criminal, No. 11.65D (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 11.65D)

Defendant acknowledges that the State proved K.B. to be between the ages of 13 and 17 and him to be more than 5 years her elder. Defendant also acknowledges that K.B.'s testimony, in and of itself, establishes he committed an act of sexual conduct. However, he claims this case involves a scenario where the "testimony is contrary to the laws of nature, or universal human experience, [and therefore,] this court is not bound to believe the witness." (Internal quotations marks omitted.) *People v. Wright*, 147 Ill. App. 3d 302, 318 (1986) (quoting *People v. Coulson*, 13 Ill. 2d 290, 297 (1958)). Arguing that the "only evidence that suggests sexual abuse occurred came from the testimony of the victim," and that the "story told by the victim is simply incredible, defies logic and is contrary to human nature," defendant claims we should, therefore, find that no sufficient evidence existed upon which to base his conviction. Defendant comes to this conclusion by claiming the victim's story concerning the first night in his apartment is not credible as she "did not report the first night of fear induced drinking games and sex. Weeks passed before she was overcome by fear and compulsion to once again robotically obey the command of the defendant and drive to his apartment at night for more alcohol

16

drinking and compelled sex."

Defendant cites K.B.'s failure to detail every characteristic of his apartment as evidence that she had never been there. Most notably, he notes she failed to mention the moist carpets, foul smell and the "comically short shower curtain." As evidence contrary to K.B.'s testimony existed concerning the color of his bed sheets and alarm clock, he submits her entire story cannot be believed. We disagree with defendant's characterization of the evidence.

Initially, we note that defendant is clearly requesting that this court reweigh the evidence, retry the defendant and find in his favor. We are not permitted to engage in such a task. *People v. Givens*, 237 Ill. 2d 311 (2010).

Defendant ignores significant evidence that corroborates K.B.'s version of the events. Most notably, K.B. indicated that the night of the first sexual encounter, "he called and told" her to meet him at the gas station from which she followed him to his apartment. The soccer game ended "sometime around nine" that night and the telephone call came thereafter. Records obtained from Sprint and entered into evidence clearly show that at 9:07 p.m. on the night of May 9, 2010, defendant initiated a phone call to K.B.'s cell phone. He initiated another phone call to K.B. at 9:28 p.m. that night. One minute later, she called him back. At 9:32 p.m., he called her phone number again. The next morning, at 7:29 a.m., defendant initiated another phone call to

17

K.B.  This fact corroborates her testimony that early in the morning, he called her to tell her that he would not be turning off into the parking lot where they were to meet for the race so that the two would not arrive at the same time.

While defendant claimed he called K.B. before the race to find out where the team was having breakfast, instead of calling the head coach, it was certainly for the jury to determine whether or not his statement or K.B.'s statement was more credible.  Defendant acknowledged that there were 18 phone contacts between himself and K.B. on the day of the Race for the Cure, many occurring well after breakfast.  Defendant also acknowledged the phone contact he had with K.B. on the night before the Race for the Cure, but offered no explanation concerning the content of those conversations.  Defendant admitted calling K.B. on the morning of the race, but claims he only did so to determine the meeting place of the group.

Certainly, a reasonable jury could conclude that K.B.'s testimony concerning the calls to and from defendant in that 12-hour time frame was more credible.  K.B. testified the calls at night after the soccer match set up a rendezvous with defendant and that the call in the early morning ensured she would not arrive at the race contemporaneously with defendant.  Defendant, claiming not to know the location of the group's meeting place, chose to call his 16-year-old player instead of the head coach.  Defendant acknowledged that he sent K.B. a text message on June

18

3, 2008, at 8:27 p.m. that read, "I told them I called you.  Find time to meet for Race For The Cure and for Survivor Day.  That was always spoke orally.  You are the only number I have."

In reviewing defendant's challenge to the sufficiency of the evidence, we must allow all reasonable inferences from the record in favor of the prosecution.  *Givens*, 237 Ill. 2d at 334.  K.B. testified to a course of sexual conduct she engaged in with defendant.  The jury weighed the credibility of both K.B. and defendant.  Despite defendant's assertion that she is beyond belief, there is clearly enough evidence contained within the record on appeal upon which a reasonable trier of fact could conclude that the State proved the elements of the offense of aggravated criminal sexual abuse beyond a reasonable doubt.

### B. Defendant's Right to Cross-examination

Defendant argues that the trial court violated his right to cross-examine K.B. when ruling that he could not question her regarding previous sexual activity.  We find no error occurred as defendant had no right to question K.B. concerning her past sexual activity.  725 ILCS 5/115-7(a) (West 2008).

Moreover, we note that even if we were to find that forbidding defendant from cross-examining K.B. with respect to her prior sexual experience was error, any error was effectively cured when the jury returned a verdict of not guilty in favor of defendant on the count alleging criminal sexual assault.

Defendant takes issue with the fact that K.B. answered "yes"

19

to the prosecutor's question asking if she "ever had sex before," and claims not allowing him to further explore that subject violated his right to cross-exam K.B. The question went to the victim's knowledge of sexual intercourse. The jury, however, acquitted defendant of criminal sexual assault, the only count that alleged defendant actually engaged in intercourse with K.B. Any possible error was harmless. We can conjure up no conceivable prejudice to defendant resulting from the victim's testimony that she had sex before.

### C. Defendant's Right to Remain Silent

Defendant claims his right to remain silent was violated during principal Christy's testimony. Defense counsel asked Christy, "So can you summarize what his statements were to you and Mr. Maurer in that first meeting?" This question drew an objection from the State in which the prosecutor commented, "I'll object. Hearsay. Defendant can testify what his version of events [is]." After the prosecutor's statement, the court dismissed the jury. Defense counsel then stated his reply to the hearsay objection and requested a mistrial, claiming the prosecutor's statement equated to an impermissible comment on defendant's right not to testify.

The prosecutor agreed that he should not have commented on defendant's ability to testify but suggested to the court that any error can be cured by "an instruction that will, can be added to the jury instructions that the jury is not to hold the

20

defendant, or hold it against the defendant for not testifying." Defense counsel acknowledged that the prosecutor did not act "with any malice or ill will" but, nevertheless, believed no instruction could cure the error and renewed his request for a mistrial.

The trial court denied that request and gave defense counsel the choice of having a limiting instruction issued or not having one issued for fear it would draw more attention to the matter. Defense counsel chose the former and the trial court issued an instruction directing the jury to disregard the statement.

Despite the limiting instruction, defendant claims the prosecutor's statement "effectively forced" him to testify and, as such, we should grant him a new trial. The State disagrees and claims that defendant has waived the issue when he chose to testify rather than assert his right to not testify.

Improper remarks by a prosecutor generally do not constitute reversible error unless they result in substantial prejudice to the accused. *People v. Johnson*, 119 Ill. 2d 119 (1987). Potential prejudice associated with improper remarks of a prosecutor is usually cured by "the prompt sustaining of an objection combined with proper jury instruction." *People v. Johnson*, 208 Ill. 2d 53, 116 (2003).

The State submits that any error that did occur was cured by the trial court's instruction. We agree. Defense counsel admitted, as noted above, that the prosecutor's remark was an

21

innocent misstatement of the prosecutor's objection.  An objection that the trial court ultimately sustained.

The State also notes that should we find that the instruction did not cure the error, then defendant has waived his right to assert it.  The State notes defendant chose to testify and waive his right not to testify.  For us to hold that by testifying he did not forfeit his right to raise this issue, the State submits, would allow defendant to "run his story by a jury in hope of seeing what, if anything, would stick.  If the jury accepted none of his testimony, defendant loses nothing because nothing was at stake, since he would be entitled to an automatic new trial.  On the other hand, if the jury acquitted him on some but not all charges [like what happened here], the defendant gains, thereby limiting his conviction exposure on trial."  We agree and further find defendant has waived this issue by testifying.

"The fifth amendment speaks only of compulsion. 'It does not preclude a witness from testifying voluntarily in matters which incriminate him.  If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been "compelled" within the meaning of the Amendment.' " *People v. Snow*, 403 Ill. App. 3d 734, 738 (2010) (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943)).

### D. Other Crimes/Prior Bad Acts

Defendant claims the court committed reversible error when

22

allowing evidence to be introduced concerning the incident in the equipment shed.  This, defendant claims, was impermissible prior-bad-acts evidence.  We review the question of whether other-crimes or prior-bad-acts evidence should have been admitted under the abuse of discretion standard.  *People v. Gonzalez*, 379 Ill. App. 3d 941 (2008); *People v. Hansen*, 313 Ill. App. 3d 491 (2000).

Evidence of other offenses is admissible if it is relevant for any purpose other than to show the defendant's disposition or propensity to commit the crime charged, including *modus operandi*, intent, identity, motive, or absence of mistake.  This list is not exclusive.  *People v Lear*, 143 Ill. 2d 138 (1991); *People v. Bedoya*, 325 Ill. App. 3d 926 (2001).  Concerning sexual crimes, evidence of prior sexual activities and bad acts can be admitted to show a defendant's intent, design, course of conduct, as well as to corroborate a victim's testimony concerning the charged offense.  *People v. Foster*, 195 Ill. App. 3d 926 (1990).

Other-crimes or prior-bad-acts evidence, though relevant, must not become a focal point of the trial.  *People v. Boand*, 362 Ill. App. 3d 106 (2005).  Courts have warned about the dangers of putting on a trial within a trial with detail and repetition greatly exceeding what is necessary to establish the particular purpose for the evidence.  *People v. Bartall*, 98 Ill. 2d 294 (1983).

"The law is well established that, in a trial for sexual

23

offenses, evidence of a defendant's prior sexual activities with the same child is an exception to the general rule that a defendant's prior bad acts are not admissible, and such evidence is admissible to show the relationship and familiarity of the parties, to show the defendant's intent, to show the defendant's design or course of conduct, and to corroborate the victim's testimony concerning the offense charged." *Foster*, 195 Ill. App. 3d at 949. Where evidence of prior bad acts is used to prove *modus operandi* or a common design, there must be a high degree of identity between the facts of the two crimes. *People v. Illgen*, 145 Ill. 2d 353 (1991). When offered for some other purpose, mere general areas of similarity will suffice. *Illgen*, 145 Ill. 2d at 373. As factual similarities increase, so does the relevance, or probative value of the other crime evidence. *Donoho*, 204 Ill. 2d 159, 184 (2003). "Unfair prejudice" speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged. *Old Chief v. United States*, 519 U.S. 172, 181 (1997).

A mini-trial can be avoided by carefully limiting the details of the other crime to what is necessary to illuminate the issue for which the other crime was introduced. *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995). When the unfair prejudice is excessive, a limiting instruction will not save admissibility of the evidence. *Nunley*, 271 Ill. App. 3d at 433.

24

Even if the trial court fails to conduct a balancing test and properly balance the probative value of the other-crimes evidence against the unfair prejudice, "[r]eversal is not warranted if it is unlikely the error influenced the jury." *People v. Boyd*, 366 Ill. App. 3d 84, 95 (2006) (citing *People v. Hall*, 194 Ill. 2d 305 (2000)). Our supreme court has repeatedly held that the improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission. *People v. Nieves*, 193 Ill. 2d 513 (2000); *People v. Hall*, 194 Ill. 2d 305 (2000).

Defendant argues that the shed incident impermissibly became the focal point of the trial, especially when considering the activity in the shed "did not constitute the commission of a sexual offense." Defendant further claims that even if this evidence is relevant, the trial court failed to engage in a mandated balancing test in an effort to determine whether its probative value outweighed its prejudicial impact. As such, defendant claims the court allowed a trial within a trial to take place.

The State submits that a mini-trial was avoided in this instance as the trial court carefully limited the evidence adduced at trial, only allowing sufficient details of the shed incident necessary to illuminate defendant's course of conduct as well as the investigatory steps taken in this matter. Defendant disagrees and claims that the majority of the State's case

25

centered on the uncharged conduct: that being, the incident in the shed. Defendant characterizes 31 pages of the 55-page transcript of K.B.'s direct testimony as being related to uncharged conduct, including 30 pages devoted to the shed incident in and of itself. Defendant further notes that the overwhelming majority of testimony by principal Christy and superintendent Maurer concerned uncharged conduct. Defendant summarizes the State's direct evidence as "85 pages of transcript showing questions and answers" and claims that "the People devoted about 48 pages to testimony regarding the uncharged conduct." Given that 56% of the State's case dealt with the events of the equipment shed, defendant argues it is clear the focal point of this trial was the uncharged conduct. Defendant submits that even if the incident in the shed was relevant, he was unfairly prejudiced by the admission of testimony concerning it and is, therefore, entitled to a new trial.

The State does not respond to defendant's direct attack on the quantum of evidence adduced at trial tied to the shed incident other than to say "the details surrounding the soccer shed incident itself were carefully limited." The State claims that the evidence concerning the school's follow-up investigation into the shed incident was independently relevant as it addressed defendant's guilty knowledge as exhibited by his monumental effort to persuade the victim to lie about something that, he claims, "did not happen." It further claims the evidence

26

revealed the course taken by the investigation, which started as an internal school matter and, therefore, was necessary to a full understanding of the State's case. Finally, the State notes there is no authority indicating that a trial judge must make a record specifically indicating that the probative value of prior bad acts evidence outweighs its prejudicial effect. Noting that all judges are presumed to know and properly apply the law (*People v. Henderson*, 336 Ill. App. 3d 915 (2003)), the State submits that it must be presumed that the trial court properly balanced the admissibility of the evidence.

We find the admission of the soccer shed incident evidence was not error. Within a week of the incident, defendant again initiated contact with the victim following the Notre Dame soccer match. This time, defendant was able to convince the victim to go to his apartment. Evidence of the soccer shed incident was relevant to evince defendant's course of conduct, tended to corroborate the victim's testimony concerning their sexual relationship that ensued shortly thereafter and established the general intimacy between defendant and the victim.

The shed incident evidence also explained the investigation in this case and how the crime was discovered. This matter began as a school investigation of alleged misconduct by an assistant coach. Prior bad acts or other crimes evidence is properly admitted in order to explain the course of a police investigation and the events leading up to a defendant's arrest. *People v.*

27

*Gonzalez*, 379 Ill. App. 3d 941, 950 (2008) (citing *People v. Hayes*, 139 Ill. 2d 89 (1990)); *People v. Tisdel*, 201 Ill. 2d 210 (2002); *People v Johnson*, 114 Ill. 2d 170 (1986).  Clearly, the evidence concerning the incident in the shed was relevant.  The only question remaining regarding the evidence is whether the quantum of it unduly prejudiced defendant.  We hold it did not.

In *People v. Johnson*, No. 1--07--0715 (Ill. App. Dec. 20, 2010), the court stated as follows:

> "The key to balancing the probative value of other crimes evidence to prove propensity against its possible prejudicial effect is to avoid admitting evidence that entices a jury to find defendant guilty *only* because it feels he is a bad person deserving punishment. [Citation.]
>
> In weighing the probative value of the evidence against the undue prejudice to the defendant, a court may consider:
>
> (1) the proximity in time to the charged or predicate offense;
>
> (2) the degree of factual similarity to the charged or predicate offense; or
>
> (3) the other relevant facts and circumstances.  [Citation.]."  (Internal quotation marks omitted.)  (Emphasis in

28

original.)  *Johnson*, slip op. at 9-10.

The balancing test discussed in *Johnson* weighs in favor of admitting the evidence.  The incident in the shed occurred close in time to the first sexual encounter between the victim and defendant.  Both instances were similar in that they were initiated by defendant and involved inappropriate touching or attempts at inappropriate touching of the victim.  As noted above, the shed incident was also relevant to show the path of investigation in this matter.  Phone records from the night of the Notre Dame game corroborate the victim's version of her first rendezvous at defendant's apartment.  As there was no evidence of conduct amounting to criminal sexual abuse taking place in the shed, the tendered jury instructions prohibited the jury from finding defendant guilty based on any activity that occurred in the shed.

We cannot say that the introduction of this evidence enticed the jury to find defendant guilty *only* because it felt he was a bad person.  We hold the trial court did not abuse its discretion in admitting evidence of the acts in the shed.

### E.  Limiting Instruction

Defendant tendered a limiting instruction modeled on IPI Criminal 4th No. 3.14 that stated as follows:

"Evidence has been received that the

defendant has been involved in an offense

other than those charged in the indictment.

29

This evidence has been received on the issue of the defendant's intent and may be considered by you only for that limited purpose.

It is for you to determine whether the defendant was involved in that offense and, if so, what weight should be given to this evidence on the issue of intent."  IPI Criminal 4th No. 3.14.

The trial court refused to give this instruction noting that the "shed incident is part of a course of conduct that's relevant here under all the circumstances of the offenses alleged in the bill of indictment even though clearly the bill of indictment alleges offenses that have to deal with the testimony of the sexual activity, but I don't think 3.14 is applicable, and it would be refused."  Defendant argues that since "no limiting instruction was given, the jury was free to convict the Defendant of a criminal offense for conduct outside the scope of the charges filed against him."  Specifically, defendant claims the jury "was improperly allowed to convict the Defendant if it believed criminal sexual abuse occurred in the equipment shed, an allegation of conduct in Woodford County, Illinois."  We disagree.

The court clearly instructed the jury as follows:

"A person commits the offense of

30

Aggravated Criminal Sexual Abuse when he commits an act of sexual conduct with a victim who is at least 13 years of age but under 17 years of age when the act is committed and he is at least 5 years older than the victim."

See IPI Criminal 4th No. 11.61.

"To sustain the charge of Aggravated Criminal Sexual Abuse, the State must prove the following proposition:

*First Proposition*: That the defendant committed an act of sexual conduct with K.B.; and

*Second Proposition*: That K.B. was at least 13 years of age but under 17 years of age when the act was committed; and

*Third Proposition*: That the defendant was at least 5 years older than K.B."

See IPI Criminal 4th No. 11.62A.

"The term 'sexual conduct' means any intentional or knowing touching or fondling by the accused, either directly or through the clothing, of the sex organ of the victim, for the purpose of sexual gratification or arousal of the victim or the accused."

31

See IPI Criminal 4th No. 11.65D.

K.B. testified that, while in the shed, defendant: grabbed her belt loop; "started to put his hands up [her] shirt *** near [her] ribs before [she] pushed his hands down"; after that, he "put his hands back on [her] belt loop before he started putting them down [her] pants." When asked how far down her pants defendant put his hands, K.B. replied, "several inches before I pulled his hands out." K.B. stated defendant did not "fondle her breasts" as his hands did not get that far up her shirt.

It is "the almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *People v. Sandoval*, 135 Ill. 2d 159 (1990). A "jury is presumed to follow the instructions that the court gives it." *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). The court instructed the jury that it could only find defendant guilty if it found sexual conduct occurred between defendant and K.B. It defined sexual conduct as touching or fondling by the accused of a sex organ of his or K.B.'s for sexual gratification. There is no evidence in the record that any such activity occurred in the shed and the State never suggested defendant committed sexual conduct in the shed sufficient to rise to the level of a crime. To conclude that the jury found defendant guilty of criminal sexual abuse based on the evidence of conduct in the shed would be to presume and conclude that the jury ignored its instructions. We find the trial court did not err in

32

failing to give defendant's instruction.

        F.   Admission of the Text Messaging Transcripts

Defendant argues the trial court committed reversible error when allowing the document containing the transcription of the text messages into evidence.  Defendant claims no proper foundation for the document existed to allow the document into evidence, that it was not properly authenticated and that its admission violated the best evidence rule.

A trial court's decision to admit documentary evidence will not be reversed absent an abuse of discretion.  *People v. Downin*, 357 Ill. App. 3d 193 (2005).  An adequate foundation is laid when a document is identified and authenticated.  *Anderson v. Human Rights Comm'n*, 314 Ill. App. 3d 35 (2000).  To "authenticate a document, evidence must be presented to demonstrate that the document is what its proponent claims."  *Gardner v. Navistar International Transportation Corp*., 213 Ill. App. 3d 242, 247-48 (1991).  A finding of authentication is merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied.  *People v. Downin*, 357 Ill. App. 3d 193 (2005).  A document may be authenticated by direct or circumstantial evidence.  *People v. Towns*, 157 Ill. 2d 90 (1993).  Authorship of a document may include a showing that the writing contains knowledge of a matter

33

sufficiently obscure so as to be known to only a small group of individuals. *Downin*, 357 Ill. App. 3d at 203. Factors that courts use in authenticating writings and other items similarly apply to e-mail messages. *Downin*, 357 Ill. App. 3d at 203.

We do not find, and the parties fail to identify, any Illinois case law concerning the admission of text messages. However, in *State v. Thompson*, 2010 ND 10, 777 N.W.2d 617, the Supreme Court of North Dakota found information contained in text messages was properly authenticated and allowed into evidence. The text messages at issue in *Thompson* involved messages sent from a wife to her husband prior to her assaulting him. While phone records indicated messages were sent between the two, the wife argued "there was no way to establish who actually sent the text messages and whether the messages were accurately transcribed." *Thompson*, 2010 ND 10, ¶14, 777 N.W.2d 617, 622.

During the *Thompson* trial, the court instructed the jury that the "evidence about the text messages" was only allowed to show defendant's state of mind as both defendant and the victim testified regarding the content and frequency of the messages. *Thompson*, 2010 ND 10, ¶11, 777 N.E.2d 617, 621. The State offered a photograph into evidence of one specific text message that included profane and threatening language. *Thompson*, 2010 ND 10, ¶7, 777 N.E.2d 617, 621. Under both the North Dakota evidentiary rules and Federal Rules of Evidence 901(a), "the proponent of offered evidence need not rule out all possibilities

34

inconsistent with authenticity or conclusively prove that evidence is what it purports to be; rather, the proponent must provide proof sufficient for a reasonable juror to find the evidence is what it purports to be." *Thompson*, 2010 ND 10, ¶21, 777 N.W.2d 617, 624. "If the court decides evidence is what its proponent claims it to be, the court may admit the evidence and the question of its weight is for the trier-of-fact." *Thompson*, 2010 ND 10, ¶23, 777 N.W.2d 617, 624. Ultimately, the court found sufficient evidence from the victim, including the circumstances of that day and his knowledge of defendant's cell phone number and signature on text messages, to authenticate the victim's testimony about the text messages received. Such evidence was sufficient to authenticate the picture of the text message. *Thompson*, 2010 ND 10, ¶26, 777 N.W.2d 617, 626.

In the case at bar, the document introduced into evidence purported to be a transcription created by the principal that recounted the messages as read to him by the victim. All acknowledged that the transcription may not have evinced, with 100% accuracy, the text messages sent from defendant to K.B. as some words were changed via the word processor's spell-check feature. Nevertheless, the dates and times contained on the document and attributed to text messages sent from defendant to the victim mirrored those identified in the phone company records. K.B. testified as to the content of the messages and defendant acknowledged the accuracy of a number of the messages

35

as transcribed by the principal.

We find the trial court did not err by admitting the transcription of the text messages. The trial judge ensured that all knew the document was exactly what it purported to be: a transcription of the victim's reading of the text messages. The judge allowed both sides to argue over their interpretation of the messages and allowed defendant to admit evidence indicating the spell-check program on the word processor used to create the document likely changed the wording or spelling of some messages. The parties then quarreled over the meaning of the substance of individual messages. As noted above, defendant acknowledged the accuracy of a number of the messages as recorded on the document. Defendant argued his intent in sending those messages that asked K.B. to change her story was simply to get her to tell the truth. The State argued that his request that K.B. change her story was evidence of his wrongdoing.

Nevertheless, the substance of the messages contained relevant evidence including defendant's attempts to get K.B. to change her story. While defendant attacks the credibility of the document's substance, bringing to light the fact that it may not have perfectly reproduced every message he sent to K.B., this does not change the fact that the trial court properly authenticated the document as being nothing more than exactly what it purported to be. Defendant did not deny sending even a single one of the purported text messages. We find no error.

36

## G. Cumulative Error

Defendant claims the cumulative effect of the alleged errors denied him due process by infringing on his right to a fair trial. As noted above, the only error that occurred during the trial involved the prosecutor's remarks concerning defendant's ability to testify. The trial court cured that error through its limiting instruction directing the jury to disregard the prosecutor's statement. Moreover, as noted above, defendant waived this error by choosing not to assert his right to remain silent.

Our supreme court noted in *People v. Albanese,* 104 Ill. 2d 504, 524 (1984), that if "none of the points relied upon by defendant constituted error, logic dictates that there is no possibility for cumulative error." Similarly, we find that where one error occurred at trial but that error was both cured and waived, logic dictates that there is no possibility for cumulative error. See *People v. Caffey*, 205 Ill. 2d 52 (2001).

## H. Sentencing

Aggravated criminal sexual abuse is a Class 2 felony. 720 ILCS 5/12-16(g) (West 2008). Class 2 felonies generally carry a sentencing range of three to seven years. 730 ILCS 5/5-4.5-35(a) (West 2008). Probation is an authorized sentence to those convicted of "all felonies and misdemeanors other than those identified" in subsection (c) of section 5-5-3 of the Unified Code of Corrections. 730 ILCS 5/5-5-3(b) (West 2008).

37

Subsection (c) prohibits probation for all who have been convicted of a qualifying offense within 10 years of committing the offense for which they are being sentenced. 730 ILCS 5/5-5-3(c)(2)(F) (West 2008). Qualifying offenses take many forms under section 5-5-3(c), but we are only concerned with those equivalent to a "Class 2 or greater felony." 730 ILCS 5/5-5-3(c)(2)(F) (West 2008).

On the order sentencing defendant, the trial court made the following notations:

> "Court finds defendant is non-probationable
>
> 730 ILCS 5/5-5-3c2F
>
> Court finds defendant is extendable 730 ILCS
>
> 5/5-5-3.2b1"

In making these findings, the trial court relied on the fact that defendant had been convicted in 2005 of aggravated assault in the State of Tennessee. While acknowledging his Tennessee conviction, defendant argues that conviction did not render him nonprobationable or extended-term eligible. Defendant claims the trial court's mistaken belief that he was both nonprobationable and extended-term eligible came from a misapplication of the law. The trial court, defendant submits, only compared the sentencing range from his Tennessee offense to Illinois's sentencing scheme when determining he was convicted of a Class 2 or greater felony within the last 10 years. This, defendant argues, was error entitling him to a new sentencing hearing.

38

We agree with defendant that the trial court, before finding defendant nonprobationable, should have compared the elements of his Tennessee offense with Illinois law to determine if the Tennessee "offense *** contained, at the time it was committed, the same elements as an offense now *** classified as a Class 2 or greater felony." 730 ILCS 5/5-5-3(c)(2)(F) (West Supp. 2009). However, we find the trial court's failure to do so does not entitle defendant to a new sentencing hearing.

The trial court made it clear that even if defendant were probationable, it would not order probation given the seriousness of the offense. The court stated that, "I don't believe under the circumstances that probation should be - - would have been or should be imposed in this case."

Our supreme court has made it clear that not every sentencing error mandates a new sentencing hearing. For example, when a trial court considers an improper aggravating factor, our supreme court has noted that "where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required." *People v. Bourke*, 96 Ill. 2d 327, 332 (1983). Courts have interpreted this language from *Bourke* to mean that where a defendant "would have received the same sentence" despite the sentencing error, remandment is not required. *People v. Bohlander*, 225 Ill. App.

39

3d 1055, 1058 (1992).

While the trial court should have compared the elements of the Tennessee crime, and not just its sentence, to those of a similar crime in Illinois, the record leaves little doubt that defendant would have received the same sentence even if he had been found probationable. As such, we find defendant is not entitled to a new sentencing hearing.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed.

Affirmed.