NOTICE
Decision filed 06/01/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180295-U

NO. 5-18-0295

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the |
| ) | Circuit Court of |
| Plaintiff-Appellee, ) | Jefferson County. |
| ) | |
| v. ) | No. 11-CF-190 |
| ) | |
| MARK ANTHONY TAYLOR JR., ) | Honorable |
| ) | Thomas J. Tedeschi, |
| Defendant-Appellant. ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justice Cates concurred in the judgment.
Justice Wharton specially concurred.

**ORDER**

¶ 1    *Held*: The defendant's conviction and sentence for first degree murder are affirmed where his claim as to jury selection is barred by the doctrine of invited error, where the trial court did not abuse its discretion in admitting evidence, and where his sentence was constitutional and not excessive.

¶ 2    This is a direct appeal from the circuit court of Jefferson County. The defendant, Mark Anthony Taylor Jr., was convicted of first degree murder. On March 23, 2018, he was sentenced to an enhanced sentence of 45 years' imprisonment followed by 3 years of mandatory supervised release (MSR). The defendant raises three points on appeal: (1) that the trial court plainly erred during jury selection, (2) that the court abused its discretion in

1

admitting evidence, and (3) that the court imposed an unconstitutional and excessive sentence. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On June 23, 2011, the defendant was charged by information with three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 2010)). On September 22, 2017, the State filed an amended supplemental information charging the defendant with a fourth count of first degree murder. It was specifically alleged that, while committing the forcible felony of attempted robbery, the defendant performed various acts that caused the death of the victim, Charles Ellis. The amended supplemental information further alleged that the State would seek a mandatory 15-year sentencing enhancement because the offense was committed while the defendant or one of his associates was armed with a firearm (730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2010)). Also on September 22, 2017, the State moved to nol-pros the first three counts against the defendant and proceeded to trial only on the fourth count.

¶ 5     Prior to trial, the defendant filed a motion to suppress his confession arguing that his youth and other factors prevented him from voluntarily, knowingly, and intelligently waiving his *Miranda* rights. After reviewing video recordings of the defendant's confession, the trial court concluded that he knowingly, intelligently, and voluntarily waived his *Miranda* rights, and his statement was voluntarily made. The court found that the defendant was a "young man but appear[ed] to be mature beyond his years," was "intelligent enough to understand what was going on," "communicated very well," and had

2

prior experience with police questioning due to his criminal history. As such, the court denied the motion to suppress.

¶ 6    In 2013, the defendant moved for a fitness hearing. He was examined by Dr. Angeline Stanislaus, who reported that the defendant "was able to maintain good attention, concentration, and focus"; "[t]here was no evidence of any cognitive deficit"; he could explain his legal rights and how the judicial process worked; he could communicate logically and rationally with his lawyer; and thus, he was fit for trial. The defendant "agree[d] with [Stanislaus's] assessment." As a result, the trial court found the defendant fit to stand trial.

¶ 7    In 2014, after the case had been transferred to a new judge, the defendant renewed his motion to suppress his confession, alleging that he had newly discovered evidence (a psychological evaluation performed by Dr. Frank Kosmicki three years before the murder) that demonstrated he was unable to waive his *Miranda* rights knowingly and voluntarily. At the hearing on the reopened motion, Dr. Stanislaus testified that, based on her evaluation of the defendant and his taped confession, the defendant was able to understand and waive his *Miranda* rights. Dr. Kosmicki testified that he had examined the defendant at age 15; at that time, the defendant scored a 62 on an intelligence quotient (IQ) test, though he did not apply himself to the test; and that people with low IQs tend to give desired responses. Dr. Kosmicki testified that he was not offering an opinion on whether the defendant had the cognitive ability to understand and waive his *Miranda* rights. The trial court ultimately granted the motion to suppress.

¶ 8    Before jury selection, the State submitted a list of proposed *voir dire* questions, including the following proposed question about accountability and the felony murder rule:

> "In this case, the defendant is charged with murder. The evidence will show that he did not commit the crime by himself. The State alleges that the defendant conspired with others to commit a robbery and that Charles Ellis was killed during that robbery. The Felony Murder Rule provides that if a person is killed during the course of the commission of a felony, all persons involved in the crime are liable for murder. What is your opinion about the law which provides that one is guilty of a crime who is not the actual perpetrator if he only assisted in the commission of the crime[?]"

At a subsequent pretrial hearing, the trial court observed that it and the parties had reviewed the list and "resolved" any disputes by revising or striking certain questions. As relevant here, the parties confirmed their agreement to delete the second sentence of the State's proposed felony murder question (*i.e.*, "The evidence will show that he did not commit the crime by himself.").

¶ 9    On October 31, 2017, the defendant's six-day jury trial commenced, with jury selection lasting 1½ days. The trial court questioned three panels of prospective jurors and then allowed the State and defense counsel to ask additional questions. As part of this questioning, the State asked each potential juror a version of the accountability and felony murder question that had been approved by the court and the parties. The defendant did not object to the State's questions about accountability and the felony murder rule. More than a dozen prospective jurors said that they either could not apply the accountability and felony murder rules, they did not think they were fair, or they did not agree with them. Some of these individuals were eventually chosen as jurors, while others were excused for various reasons.

¶ 10   In its opening statement, the State asserted that early on May 31, 2011, the defendant, Demandre Black, Damondros James, and Christopher Wells killed Charles Ellis, a 73-year-old taxicab driver, during an attempted robbery. Several law enforcement officers and emergency responders testified about the crime scene and the physical evidence collected during their investigations. The first officers to respond to the scene found the victim slumped over in the driver's seat of his cab with facial abrasions, blood coming from his mouth, his dentures in his lap, and the taxicab microphone in his hand. The car was running and in gear, but the victim's foot was on the brake. No life-saving procedures were attempted because the victim was already deceased.

¶ 11   Officers responded to the address where the victim picked up his last fare. That address produced no leads, but in canvassing the area, they spoke with two bystanders. Information obtained from those individuals caused the officers to go to Jykeece Oliver's apartment, which was nearby. After Oliver consented to a search of her residence, officers found the defendant, Black, and Wells inside as well as a .380-semiautomatic pistol under the mattress upon which Wells was found lying. Officers arrested the men and learned during subsequent questioning that James (who was not at Oliver's house) had also participated in the robbery and fired a .22-caliber handgun at the victim. Police officers searched James's residence, found .22-caliber bullets under his bed, and arrested him.

¶ 12   Dr. Raj Nanduri, a forensic pathologist who conducted the victim's autopsy, testified that the victim died from a gunshot wound that struck his back and traveled through his left chest. The victim had also suffered facial injuries, including a large

5

laceration on his mouth, which was indicative of a blunt force injury consistent with being hit in the face. A .22-caliber bullet was removed from the victim's body.

¶ 13    Forensic scientists and crime scene investigators testified that (1) Wells's fingerprint was found on the outside of the rear driver's side door of the victim's cab; (2) a fired cartridge casing recovered from the crime scene matched the .380-semiautomatic pistol that was found under the mattress that Wells was lying on when he was arrested; and (3) although James's handgun was not recovered, the .22-caliber bullet recovered from the victim's body was similar to the .22-caliber ammunition that was found under James's bed.

¶ 14    Several civilian witnesses also testified on behalf of the State. Another taxicab driver testified that he discovered the victim in his taxicab after the shooting, informed dispatch, and waited for police to respond. A witness who lived near the crime scene testified that, from his bed, he could hear a man ask, "Why are you doing this to me?" followed by "noises that sound liked fireworks." He then heard three boys running by the house while laughing, but he never saw them. Another witness testified that she was at Oliver's apartment on the night of the murder when she saw Wells and two other males that she could not identify visit the apartment, leave, and return. Upon their return, one of the individuals fell on the floor and one was out of breath. She heard them talking about an old man as they went upstairs, and later, police officers arrived the apartment.

¶ 15    A 9-1-1 dispatcher on duty on May 31, 2011, testified about the phone calls he received that night. He spoke to a cab company dispatcher who told him that about 30 minutes prior to the calls related to the shooting, one of his drivers reported a suspicious fare where the passengers acted strangely, and the cab driver asked them to exit the cab

6

without paying. Another witness, the dispatcher for the cab company that employed the victim, testified about getting the call for the last fare assigned to the victim. The cab dispatcher gave the phone number associated with the victim's last fare to the police.

¶ 16    Michael Sluder, a cab driver and the victim's friend, was the driver who reported the suspicious fare on the night of the murder. Sluder testified that he picked up two black males less than an hour before the victim's murder in the same area where the murder occurred. One of the men sat in the front passenger seat and the other sat in the back directly behind the driver's seat, which Sluder found unusual. Both men acted strangely in that they turned their heads so he could not see their faces. Sluder grew concerned and stopped the car. The man in the passenger seat got out but held the door open with his foot while the man in the back seat "kept digging in his jeans for something." Sluder told the men, "Get out or I'm going to hurt us both," started driving, and the men "bailed out." Sluder was unable to identify the men who got in his car that night. However, officers were able to confirm that the phone number used to arrange Sluder's suspicious fare and the victim's last fare both matched the phone in Black's possession when he was arrested.

¶ 17    The State called Wells to testify against the defendant. Wells testified that he, Black, and the defendant met up around 7 p.m. on the night of the murder. They hung out, rode bikes, and eventually ended up at Oliver's apartment. Wells said that it was no one's idea to rob a taxicab, but that the defendant brought it to everyone's attention, and they all agreed on a plan. James joined the group later and agreed to participate in the plan. After James arrived at Oliver's apartment, he showed everyone the revolver he was carrying. Wells said they tried to rob two cabs that night, and they called for the cabs using Black's

cell phone. Wells and the defendant were inside the first cab while Black and James were outside waiting at a designated location on Herbert Street. Wells testified that the first attempt at robbing a cab failed because the driver told them to get out of the car.

¶ 18    Wells testified that they developed a plan as to how to rob the second cab. Part of the plan was for the defendant to put the car in park and turn it off from the front passenger seat once the cab reached the planned robbery spot where James and Black would be waiting. When they arrived at the spot, the defendant did not carry out the plan; instead, he struck the victim in the face. The victim attempted to fend off the defendant's blows and, when he got free, he started to drive away. James and Wells then fired their guns; Wells shot the .380-caliber gun and James shot a small revolver. Wells was standing near the back bumper of the cab while James was near the driver's side door.

¶ 19    Wells testified that they never intended to murder the victim. Wells only fired his gun because James fired first, and they were trying to get the victim to stop the cab. After firing the guns, everyone ran away from the scene; James went his own way, but Wells, Black, and the defendant all ran back to Oliver's apartment. When they got to Oliver's, Wells went to bed and hid the gun under the mattress. During his testimony, Wells stated that he entered into an open plea agreement with the State, in which he pled guilty to felony murder and agreed to testify truthfully in the defendant's case in exchange for the State's agreement to not pursue a firearm sentencing enhancement.

¶ 20    The State also called a witness named Stacy Garrison (formerly known as Stacy Ellis) to testify about a letter she received purportedly from the defendant that included a confession to the victim's murder. Prior to Garrison's testimony about the letter, the State

filed a motion to enter the letter given to Garrison into evidence. The motion asked the trial court to enter People's Exhibit 61, which was a copy of the letter, into evidence because the original letter was missing or had been destroyed. The State argued that Garrison could provide foundation for the letter by testifying that she received the letter and that the copy appeared to be in the same condition as the original. The State told the trial court that the biggest issue was authenticating the letter. The State relied on *People v. Munoz*, 70 Ill. App. 3d 76 (1979), as an analogous case because it also "involved the admission of a letter written by an inmate in which there was no direct proof of authorship." The State argued that authentication with circumstantial evidence was allowed in *Munoz* where the letter "contained information known to a small number of individuals, it appeared to originate from the defendant's cell, and it was signed with the defendant's nickname." The State completed the analogy by asserting that the letter in this case was signed by the defendant "and appears to originate from E Block, where Defendant was housed at the time the letter was written. Moreover, it contains information known only to three other individuals."

¶ 21    Outside the presence of the jury, the defendant objected to the admissibility of the letter on the grounds of authentication and foundation. Defense counsel argued that no one knew how Garrison received the letter, there was no witness that could testify about the letter's delivery, and the letter from the *Munoz* case was different because the writer signed it with a nickname and a jail identification number, whereas this letter was signed only by "Mark" from "E Block," without further identification. Counsel also argued that because the letter was written a year and a half after the murder, the facts were well known within the community and were not specific enough to authenticate the identity of the writer.

9

¶ 22    The trial court decided to have Garrison first testify outside the presence of the jury. After hearing her testimony, the court decided to admit the letter in a redacted form as People's Exhibit 61A. Garrison then testified before the jury that she received a folded-up piece of paper with her name on it on November 15, 2012. The letter was slid under her door while she was incarcerated in the same jail as the defendant. At the time she received the letter, Garrison went by the name Stacy Ellis. Stacy Ellis was also the name of the victim's daughter, but the Stacy Ellis n/k/a Garrison who received the letter and testified at trial was not the victim's daughter. Garrison explained that she did not know who slid the letter under her cell door, but it was probably "one of the trustees, which are other inmates that are currently incarcerated" who perform tasks around the jail. The letter was signed "Mark" from "E Block," and that was the only letter she received from the sender. Garrison did not know the defendant, had never met him, had never had a conversation with him, and did not know his handwriting. She gave the letter to a corrections officer at the jail because she was not the intended recipient.

¶ 23    The letter acknowledged that the intended recipient lost her father and the writer apologized for what he did to the victim's family. The writer promised that he did not mean to hurt the victim and that if he had known what was going to happen, he would not have gone along with it. The writer wished that he could have jumped in front of the bullet that night and said he should have known better but was young and dumb. The letter also included personal details about the writer, including that he lost his grandmother, that his mother killed his father before he was born, and that "Chris W." was the one who did it.

¶ 24    Following Garrison's testimony and prior to publishing the letter to the jury, the trial court instructed the jury that "[i]t is for you to determine whether the defendant made the statement [in the letter] and, if so, what weight should be given to the statement. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made."

¶ 25    The State also called Princeton Turner, who testified that the defendant confessed to the crime while they were in jail. Turner said the news came on television and it was about an individual who had been killed—this prompted the defendant to take credit for the crime being discussed on the television. Turner testified that the defendant told him "everything that happened." The defendant specifically said he committed the crime with Wells, James, and Black. The defendant said they called the cab and tried to rob him, but that James and another "boy" shot the driver. Turner learned from the defendant that a .380-caliber gun and a .22-caliber gun were used during the robbery. The defendant told Turner that they then returned to a girl's apartment in the projects, where they were arrested.

¶ 26    At the time of the defendant's trial, Turner was in prison on drug and weapons charges, and he had a criminal record that included a juvenile sexual offense. Turner did not receive a benefit for sharing this information or for testifying, and no one had made him any promises in exchange for his testimony. Testifying against the defendant may have been to Turner's detriment in that he had to be transferred to another facility due to threats from the defendant's family, and his new facility did not have space in the programs Turner needed for early release and earning his general education diploma.

11

¶ 27 Turner's testimony was corroborated by Detective Jeremy Reichert, who testified that the defendant was arrested only a few hours after the murder and taken to jail. The next day, Turner told police that he had information about this case. At the time Turner first spoke with police, it was very early in the investigation and few details had been publicly released. Turner told police "specific details" about the murder "that it would take someone with unique knowledge to know." On cross-examination, Reichert confirmed that Turner gave him information about the defendant.

¶ 28 After the State rested its case, the defense filed a motion for directed verdict, which was denied. The defendant did not testify or present any evidence in his defense.

¶ 29 The jury was instructed as to principles of felony murder and accomplice accountability. The jury found the defendant guilty of first degree murder and further found that the defendant, or one for whose conduct he was legally responsible, was armed with a firearm during the commission of the charged offense.

¶ 30 On November 28, 2017, the defendant filed a posttrial motion for a new trial arguing, *inter alia*, that the letter that was given to Stacy Garrison should not have been admitted because the State did not meet its burden of proving the foundation or authenticity of the letter and that imposition of the firearm sentencing enhancement was a violation of due process and the proportionate penalties clause. In response, the State asserted that the trial court properly admitted the letter and that the 15-year firearm enhancement was also proper based on settled law. The court denied the motion upon finding that it had "heard or seen nothing that would change [its] prior rulings."

¶ 31    The trial court ordered a presentence investigation (PSI) report to be completed prior to the defendant's sentencing. The report detailed that the defendant's father was deceased, and that the defendant had not had contact with his mother since he was seven years old. The defendant did not know his two older brothers. The defendant's mother killed his father when the defendant was approximately three years old, so the defendant went to live with his grandmother until she died. The defendant then lived with his aunt where crack cocaine use and domestic violence were present. He entered the foster care system in 2007. The defendant never married or fathered children.

¶ 32    The PSI report set forth the defendant's schooling and showed that he attended three different high schools during his ninth-grade year, one of which he was suspended from. The defendant completed the tenth and eleventh grades at Hoyleton Children's Home and completed the twelfth grade at Mt. Vernon Township High School. He graduated in May 2011. He often had good grades, including straight A grades one semester.

¶ 33    The defendant's mental health history included a diagnosis of attention deficit hyperactivity disorder (ADHD) as a pre-teenager; he was prescribed Ritalin but stopped taking it around age 15. He also participated in mental health counseling for a period of time but did not see a benefit from the counseling or the Ritalin. The defendant also saw a therapist for anger management issues during his time at Hoyleton Children's Home.

¶ 34    While the defendant denied being involved with alcohol, he started smoking cannabis at age 14 and continued smoking cannabis until the date of his arrest. He was convicted as an adult of aggravated battery in 2010; it was a Class 3 felony conviction that

13

resulted in an unsuccessful 12-month term of conditional discharge due to charges being filed in the current case.

¶ 35   On March 23, 2018, a sentencing hearing was held. The State submitted the 2010 aggravated battery conviction as aggravating evidence. Defense counsel asked the trial court to consider Dr. Kosmicki's psychological evaluation report as mitigating evidence. The victim's son provided a victim impact statement and asked the court to impose the maximum sentence.

¶ 36   The trial court stated that it would review and take notice of the PSI, Dr. Kosmicki's report, and the defendant's criminal history. In addition to the information already discussed, the parties' submissions collectively showed: (1) the defendant joined a gang as a youth but reported that he quit the gang in 2004; (2) he had persistent behavioral and learning issues in school and in his foster homes; (3) the defendant had a juvenile conviction for theft; (4) he had a history of violence that did not result in convictions, including choking a woman, breaking another person's jaw, and fighting in school; (5) at some point in the defendant's childhood, he accidentally shot and killed a peer in the face with a gun; (6) the defendant's group home reported that he had a "manipulative attitude"; (7) he had "a history of cruelty to animals," including one occasion when he "hung a cat by a noose"; (8) he had a history of drug and alcohol abuse; (9) the defendant was transferred to multiple foster homes due to his "verbal and physical aggression, refusal to follow home rules, and complaints of inappropriate interactions with female residents"; (10) the defendant failed to take responsibility for his misconduct, and at age 15, had "a history of bullying/threatening others, initiation of physical fights, physical cruelty to

14

others, cruelty to animals, engagement in fire-setting, property destruction, stealing, violation of curfew, and running away from home"; (11) he had been diagnosed with conduct disorder, major depressive disorder, posttraumatic stress disorder, and "Mild Mental Retardation"; and (12) he reported having problems with depression, anxiety, acting out, anger, and suicidal ideations.

¶ 37    The sentencing range for the defendant's crime was 35 to 75 years in prison. See 730 ILCS 5/5-4.5-20 (West 2010) (sentencing range for murder); *id*. § 5-8-1(a)(1)(d)(i) (firearm enhancement). After the conclusion of the sentencing evidence, the State argued in aggravation that the defendant's actions caused harm, he had a prior history of delinquency, the trial court should consider the importance of deterrence, the crime was committed against a person greater than 60 years old, the defendant beat the victim before the shooting, the defendant and Wells were traveling via public transportation when the crime occurred, and the defendant's intellectual disability was the only mitigating factor. The State also explained that Black, who provided the gun and phone to Wells, received a 20-year sentence for aggravated battery with a firearm. Wells, "who was the only juvenile involved," received a 26-year sentence "partially based on his youth and for his cooperation as a witness in the case against" the defendant. James, who was "the actual shooter that caused the death" of the victim, received a 50-year sentence. The State requested that the defendant receive a 26-year sentence, with the 15-year firearm enhancement, for a total of 41 years' imprisonment.

¶ 38    Defense counsel argued in mitigation that the defendant suffered from an intellectual disability, there were substantial grounds tending to excuse or justify his

15

conduct while failing to establish a defense, and his criminal conduct was induced or facilitated by someone else. Counsel highlighted portions of Dr. Kosmicki's report to the trial court. Counsel requested the minimum 20-year sentence and urged the court not to apply the firearm enhancement. In his statement of allocution, the defendant apologized to the victim's family.

¶ 39 The trial court reviewed the factors in aggravation that the defendant had a history of delinquency, the sentence was necessary to deter others from committing the same crime, and he committed the offense against a person who was 60 years of age or older. The court found that the defendant's intellectual disability was a mitigating factor.

¶ 40 The trial court thanked defense counsel for bringing Dr. Kosmicki's psychological evaluation report to its attention. Additionally, the court stated that it had learned "a lot about" the defendant from the PSI and Dr. Kosmicki's report, and that "[the defendant], his home life, never had a chance." The court observed that the defendant had witnessed his mother kill his father and had been homeless for a time, and concluded, "It's tragic all the way around." The court repeatedly noted that the defendant was only 18 years old at the time of the murder and described the defendant and his codefendants as "kids" who would have been "riding bicycles" not long before the murder. The court acknowledged that the defendant did not possess or discharge a firearm during the murder.

¶ 41 After considering all the evidence, relevant factors, and the parties' arguments, the trial court sentenced the defendant to 30 years' imprisonment as to first degree murder and 15 years' imprisonment pursuant to the firearm sentencing enhancement, to be followed by 3 years of MSR.

16

¶ 42 On May 1, 2018, the defendant filed a motion to reduce sentence, arguing that his sentence was an abuse of discretion, that his "[l]ow IQ and mental functioning should have been given greater weight towards mitigation of the sentence." The motion also argued that because he was guilty through accountability, that factor should have mitigated the sentence. The defendant challenged the firearm enhancement as a violation of due process and as a disproportionate penalty. Finally, it was asserted that the sentence must "relate to the defendant and his culpability and rehabilitative potential."

¶ 43 A hearing on the motion to reduce sentence was held on May 25, 2018. Defense counsel argued that the trial court should have considered the defendant's juvenile brain development and maturity. Counsel explained the developments within the fields of science and medicine about the juvenile mind, relying on *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny. Counsel argued that the defendant's sentence violated the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). He also argued that the cases were applicable because the defendant faced a mandatory firearm enhancement to his sentence, and the fact that the defendant was older than 18 years old did not limit the applicability of the cited cases. Defense counsel encouraged the court to revisit the discretionary sentence and argued that "it just doesn't ring true" that the defendant's culpability warranted a sentence only five years less than the codefendant "who actually killed somebody."

¶ 44 In response, the State argued that the cited cases did not apply. It highlighted that the defendant knew his peers had guns, and he agreed to continue on to a second robbery

17

attempt after the first one failed. The trial court recalled that it did consider the defendant's youth, history, and intellectual ability in imposing the sentence. The court was aware of the developing body of law relating to sentencing of "youthful offenders"; however, the court denied the defendant's motion to reconsider the sentence.

¶ 45    The defendant filed his notice of appeal on May 25, 2018.

¶ 46                                II. ANALYSIS

¶ 47    On appeal, the defendant makes three contentions. First, he argues that the trial court plainly erred in allowing the State to question prospective jurors about accountability and the felony murder rule during *voir dire*. Second, he asserts that the court abused its discretion in admitting the letter given to Stacy Garrison into evidence. Third, he contends that the court imposed an unconstitutional and excessive sentence.

¶ 48                              A. Jury Selection

¶ 49    The defendant first argues that the trial court plainly erred in allowing the State to question prospective jurors about accountability and the felony murder rule during *voir dire*. Because he failed to preserve this claim of error by raising a timely objection or including it in his posttrial motion, the defendant requests that we review it under the plain-error doctrine. *People v. Sebby*, 2017 IL 119445, ¶ 48. In response, the State asserts that the defendant's claim is barred by the doctrine of invited error or acquiescence. For the reasons below, we agree with the State's position.

¶ 50    There are certain circumstances in which a defendant's invitation or agreement to an issue later challenged on appeal "goes beyond mere waiver." (Internal quotation marks omitted.) *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). "Under the invited-error doctrine,

18

a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." (Internal quotation marks omitted.) *People v. Cox*, 2017 IL App (1st) 151536, ¶ 73. "Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004).

¶ 51　In this case, we find that the defendant not only failed to timely object to the State's *voir dire* questions or raise the issue in his posttrial motion, he acquiesced in them being posed to the jury. The record reflects that prior to jury selection, the State submitted a list of proposed *voir dire* questions including the question at issue on appeal. The trial court stated during a subsequent pretrial hearing that it and the parties had reviewed the list and "resolved" any disputes by revising or striking certain questions. As relevant here, the parties confirmed their agreement to delete a sentence in the State's proposed accountability and felony murder rule question. Neither the defendant nor defense counsel disagreed with the court's impression as to their agreement to the proposed question. Thus, the record affirmatively shows that the defendant consented to this question being asked by the State, and he may not now attack the question to which he agreed. See *id*.; *Cox*, 2017 IL App (1st) 151536, ¶ 73; see also *People v. McGuire*, 2017 IL App (4th) 150695, ¶¶ 29-34, and *People v. Bowens*, 407 Ill. App. 3d 1094, 1099-1101 (2011) (finding acquiescence during jury selection). Accordingly, we find that the defendant's claim is barred by the doctrine of invited error, and the cases cited by the defendant to the contrary are distinguishable.

19

¶ 52                    B. The Letter That Was Given to Stacy Garrison

¶ 53    The defendant next asserts that the trial court abused its discretion in admitting the letter that was given to Stacy Garrison into evidence. The defendant argues that the letter was not properly authenticated as required to lay a satisfactory foundation. We disagree.

¶ 54    The admissibility of evidence is a matter within the sound discretion of the trial court. *People v. Fillyaw*, 2018 IL App (2d) 150709, ¶ 44. Thus, a court's decision to admit evidence will not be reversed absent an abuse of discretion. *Id.* An abuse of discretion occurs where the court's decision is unreasonable, arbitrary, or fanciful, or "where no reasonable person would take the view adopted by the trial court." *Id.*

¶ 55    A proper foundation is laid for the admission of documentary evidence when the document has been identified and authenticated. *People v. Chromik*, 408 Ill. App. 3d 1028, 1046 (2011); Ill. R. Evid. 901(a) (eff. Jan. 1, 2011). To authenticate a document, the proponent must present evidence to demonstrate that the document is what the proponent claims it to be. *Chromik*, 408 Ill. App. 3d at 1046. The proponent need only prove a rational basis upon which the jury may conclude that the document did in fact belong to or was authored by the party alleged. *People v. Downin*, 357 Ill. App. 3d 193, 203 (2005). Illinois Rule of Evidence 901(a) (eff. Jan. 1, 2011) is identical to the federal rule of evidence relating to authenticating a document, and "both tend to be liberally construed favoring admission and subjecting actual authorship to the judgment of the jury." *Fillyaw*, 2018 IL App (2d) 150709, ¶ 49 (citing *Munoz*, 70 Ill. App. 3d at 87-88).

¶ 56    Documentary evidence may be authenticated by either direct or circumstantial evidence. *Downin*, 357 Ill. App. 3d at 203. Circumstantial evidence of authentication

20

includes such factors as appearance, contents, substance, and distinctive characteristics, which are to be taken into consideration with the surrounding circumstances. *People v. Ziemba*, 2018 IL App (2d) 170048, ¶ 52; see also *Downin*, 357 Ill. App. 3d at 203; Ill. R. Evid. 901(b)(4) (eff. Jan. 1, 2011). As such, documentary evidence may be authenticated by its contents if it is shown to contain information that would only be known by the alleged author of the document or, at the very least, by a small group of people including the alleged author. *Id*.

¶ 57 The trial court, serving a limited screening function, must then determine whether the evidence of authentication, viewed in the light most favorable to the proponent, is sufficient for a reasonable trier of fact to conclude that authentication of the document is more probably true than not. *In re Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 76. If so, the court should allow the evidence to be admitted. *Id*. The court's finding of authentication in that regard is "merely a finding that there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the basic authentication requirements are satisfied." *Downin*, 357 Ill. App. 3d at 202-03. If the court, after serving its screening function, allows the evidence to be admitted, the issue of authorship of the document is then ultimately up to the jury to determine. *Id*. at 203.

¶ 58 In *Munoz*, the reviewing court addressed the question of the foundation necessary for the authentication of a private letter. *Munoz*, 70 Ill. App. 3d at 83-88. There, the trial court admitted a letter into evidence that was purportedly written by defendant and sent to his girlfriend. The letter was signed with defendant's nickname, and it had defendant's

21

correct jail address on the envelope. The court held that the letter was properly admitted, noting that authentication does not require that authorship by all others besides the purported writer be disproven. *Id*. at 88. The court stated that the fact that the letter was signed with defendant's nickname, it appeared to come from defendant's cell, and it contained information that was known to defendant constituted a *prima facie* showing that would justify the court in allowing the jury to make the ultimate determination of authorship. *Id*.

¶ 59    In the present case, the defendant argues the letter given to Stacy Garrison was not properly authenticated because Garrison did not recognize the defendant's handwriting. Prior to receiving the letter, Garrison had never spoken with the defendant and had not received any other correspondence from him. However, we find that proof of the defendant's handwriting was not necessary to authenticate the letter where such authentication may be made by circumstantial evidence. See *People v. Faircloth*, 234 Ill. App. 3d 386, 391-92 (1992) (similarly finding).

¶ 60    Viewed in the light most favorable to the proponent, the following circumstantial evidence supported that the defendant was the author of the letter that was given to Stacy Garrison. Garrison received the letter in question on November 15, 2012, while she was incarcerated in the same jail as the defendant. The letter was slid under Garrison's door, and she testified that the copy produced at trial appeared to be in the same condition as the original. The letter was addressed to Stacy Ellis, *i.e.*, the victim's daughter, and it was signed by "Mark" from "E Block," which was the area of the jail that housed male inmates. The letter also contained information that would have only been known by the defendant

22

or a small group of people including him. Specifically, the writer knew that the intended recipient lost her father, that the victim had been shot, and that "Chris W." had been one of the shooters. The writer admitted to being "young and dumb" at the time of the murder and included personal details about himself, including that he lost his grandmother and that his mother killed his father before he was born.

¶ 61 The defendant contends that the evidence was insufficient to authenticate the letter because, in contrast to *Munoz*, the writer did not use a nickname to sign the letter and did not include a specific jail identification number. Nevertheless, the letter was signed by "Mark" from "E Block," which is the defendant's first name and the part of the jail where he would have been housed at the time the letter was delivered. The defendant also takes issue with the fact that the letter was delivered a year and a half after he was incarcerated, and thus, other inmates could have known the information included therein. This argument is misplaced, as the *Munoz* court held that authentication did not require that authorship of all others beyond the purported writer be disproven. *Munoz*, 70 Ill. App. 3d at 88.

¶ 62 Additionally, the defendant argues that the letter cannot be authenticated because there was no evidence as to who delivered the letter to Garrison's jail cell. Garrison explained that she did not know who slid the letter under her cell door, but it was probably "one of the trustees, which are other inmates that are currently incarcerated" who perform tasks around the jail. Nevertheless, the identity of the individual who delivered the document "is irrelevant as to whether there is a rational basis for finding the document to be sufficiently authenticated." *Fillyaw*, 2018 IL App (2d) 150709, ¶ 53. Thus, this argument is without merit.

¶ 63   Finally, the defendant contends that the letter was insufficiently authenticated because details in the letter were incorrect. He specifically highlights that the letter said his mother killed his father before he was born, but the defendant previously reported that this occurred when the defendant was a baby. The defendant also points out that the letter said he did not have a mother, but the defendant did have a mother. This fact does not help the defendant's position, as the PSI revealed he had no contact with his mother since he was a child, thus the language in the letter could have been alluding to the fact that he did not have a relationship with his mother. Further hindering the defendant's argument, Dr. Kosmicki testified at a pretrial hearing that the defendant was not a good historian, in that he would get dates and details wrong. Similarly, his argument that the letter's proclamation that "Chris W." killed the victim was incorrect because the evidence revealed James fired the fatal shot is without merit as he has failed to show that the defendant knew that fact. Notwithstanding, these allegedly incorrect details would only concern the weight to be afforded the document, not its admissibility. See *id*. ¶ 52 (similarly finding).

¶ 64   Based on the foregoing, we find that the trial court did not abuse its discretion in admitting the letter given to Stacy Garrison into evidence. Thereafter, the defendant was free to, and did, challenge the genuineness of the letter. It was for the jury to make the ultimate determination of authorship.

¶ 65                                 C. Sentencing

¶ 66   Lastly, the defendant contends that the trial court imposed an unconstitutional and excessive sentence. For the following reasons, we disagree.

24

¶ 67    It is well settled that a trial court is given broad discretion in fashioning a sentence. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). When a sentence falls within the statutory sentencing range for an offense, it may not be disturbed absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74 (1995). A court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable to the extent that no reasonable person would agree with it. *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 32. The court is given such deference because it is in a better position to consider, among other things, defendant's credibility, mentality, demeanor, general moral character, age, habits, and social environment. *Id.* A proper sentence balances the seriousness of the offense with the objective of restoring a defendant's rehabilitative potential. Ill. Const. 1970, art. I, § 11.

¶ 68    The Unified Code of Corrections permits the trial court to consider certain statutory factors in aggravation and mitigation when imposing a sentence of imprisonment. 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2010). In fashioning the appropriate sentence, the court must carefully weigh all of the factors in mitigation and aggravation, which include defendant's age, demeanor, habits, credibility, criminal history, social environment, and education as well as the nature and circumstances of the crime and of defendant's conduct in the commission of the crime. *People v. Calhoun*, 404 Ill. App. 3d 362, 385 (2010). When such factors have been presented for the court's consideration, it is presumed, absent some contrary indication, that the factors have been considered. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). A court has considerable latitude in sentencing a defendant, as long as it neither ignores relevant mitigating factors nor considers improper aggravating factors. *Id.* at 157. When reviewing a court's sentencing decision, the reviewing court should not

focus on a few words or statements made by the court. *People v. Ward*, 113 Ill. 2d 516, 526 (1986). Instead, the determination of whether the sentence was improper must be made by considering the record as a whole. *Id*. at 526-27.

¶ 69 The defendant here was convicted of first degree murder with a sentencing range of 20 to 60 years' imprisonment, and based on the jury's finding that he or one for whose conduct he was legally responsible was armed with a firearm during the commission of the offense, he was eligible for an extended term sentence of between 35 and 75 years' imprisonment. He was sentenced to 45 years' imprisonment followed by 3 years of MSR, which was within the extended term sentencing range.

¶ 70 The defendant's first claim of error with respect to his sentence is that his *de facto* life sentence of 45 years' imprisonment violates the eighth amendment to the United States Constitution as applied to him. An as-applied challenge to a defendant's sentence requires a showing that the sentence is unconstitutional as it applies to the specific facts and circumstances of defendant's case. *People v. Harris*, 2018 IL 121932, ¶ 38. Due to the fact-specific nature of an as-applied constitutional claim, it is necessary that the record be sufficiently developed in order for a reviewing court to consider it. *Id*. ¶ 39. As further explained below, we find that the record was sufficiently developed for us to consider the defendant's as-applied constitutional claims.

¶ 71 In *Miller*, 567 U.S. at 479, the United States Supreme Court held that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." In reaching this conclusion, the Court found that a mandatory sentence of "life without parole for a juvenile

26

precludes consideration" of the juvenile's age and its "hallmark features," including the juvenile's family and surrounding home environment, the extent of the juvenile's participation in the offense, the effects of familial or peer pressure, the "inability to deal with police officers or prosecutors," the incapacity to assist the juvenile's own attorneys, and the possibility of rehabilitation. *Id.* at 477-78. The *Miller* Court announced that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489.

¶ 72 More recently, the Illinois Supreme Court has held that *Miller* applies to discretionary life sentences without parole for juvenile defendants. *People v. Holman*, 2017 IL 120655, ¶ 40. However, our supreme court has declined to extend *Miller* to offenders who are 18 years of age or older, finding that the *Miller* Court "confirmed that the age of 18 is the legal line separating adults from juveniles" and that the protections of *Miller* only apply to juvenile offenders. *Harris*, 2018 IL 121932, ¶¶ 58-61; see also *People v. LaPointe*, 2018 IL App (2d) 160903, ¶ 44. Whether a sentence is constitutional is a question of law, which we review *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 73 The defendant in this case received a 45-year sentence for first degree murder, which was within the applicable discretionary sentencing range. The parties do not dispute that the defendant was 18 years old at the time of the offense and was therefore an adult. Accordingly, the *Miller* protections under the eighth amendment are simply not implicated in this case. See *Harris*, 2018 IL 121932, ¶¶ 58-61; see also *People v. White*, 2020 IL App (5th) 170345, ¶ 20 (rejecting defendant's as-applied challenge under the eighth amendment); *People v. Herring*, 2018 IL App (1st) 152067, ¶ 103 (noting that defendant

27

was an adult for sentencing purposes and rejecting "any challenge" on eighth amendment grounds); *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 31 (rejecting defendant's as-applied challenge under the eighth amendment). Therefore, the defendant cannot benefit from the specific considerations that attend youth at sentencing. Further, with respect to the defendant's as-applied eighth amendment challenge, we are not persuaded that the specific facts and circumstances presented in this case render him more akin to a juvenile subject to *Miller* protections and less like an adult, or that his sentence is cruel and unusual. See *Harris*, 2018 IL 121932, ¶¶ 38-39 (an as-applied constitutional claim, by definition, depends on the specific facts and circumstances of an individual defendant).

¶ 74 The defendant additionally argues that his sentence violated the proportionate penalties clause of the Illinois Constitution as applied to him. The States responds that this clause is also inapplicable to the defendant's sentence because he was an adult offender, and his 45-year sentence was discretionary and not mandatory.

¶ 75 The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 76 In asserting that his sentence violated the proportionate penalties clause, the defendant relies on *People v. House*, 2019 IL App (1st) 110580-B (in which a 19-year-old defendant with no prior violent criminal history received a mandatory life sentence). However, we find that *House* does not apply. In the original opinion in *House*, and on remand from the supreme court, the First District's ruling was largely premised on the fact that defendant was convicted on a theory of accountability where his culpability and

28

involvement in the crime were minimal. *House*, 2015 IL App (1st) 110580; *House*, 2019 IL App (1st) 110580-B, ¶ 32 ("As discussed throughout our previous analysis, defendant's conviction under the theory of accountability weighed heavily in our conclusion that his mandatory natural life sentence shocked the moral conscience of the community."). The court emphasized the fact that the young defendant was not present at the scene of the murder but received "the same mandatory sentence of natural life as *** [the] codefendant who participated in the shooting of the victims," while another codefendant was released from the penitentiary during resentencing because he was 17 years old when the offense occurred. *House*, 2019 IL App (1st) 110580-B, ¶ 46.

¶ 77    The *House* court also noted that a mandatory sentence does not afford a trial court "any discretion if an offender is found guilty of triggering offenses," and the "lack of discretion afforded the trial court for the imposition of a mandatory life sentence is especially relevant when the defendant is a young adult, over 18, but still not considered a fully mature adult." *Id*. ¶ 60. The court therefore found that as applied to defendant, the mandatory natural life sentencing statute at issue violated the proportionate penalties clause. *Id*. ¶¶ 65-66. The matter was remanded for a new sentencing hearing so that the trial court could have "the ability to consider the relevant mitigating factors prior to imposing a sentence of such magnitude." *Id*. ¶ 65.

¶ 78    We acknowledge that here, like in *House*, the defendant was convicted on a theory of accountability. However, unlike the "minimally culpable" defendant in *House* who merely acted as a lookout, the defendant here brought the idea of robbing a taxicab to his codefendants' attention, knew there were firearms involved, was present at the crime scene,

29

and actively participated by beating the victim in the face. Although he was not the most culpable codefendant involved in the murder, we cannot say he was the least culpable of offenders. Additionally, the defendant's sentence was not mandatory. Rather, he received a discretionary 45-year sentence that included a mandatory 15-year firearm sentencing enhancement. See *People v. Charleston*, 2018 IL App (1st) 161323, ¶¶ 17, 33-36 (similarly distinguishing cases involving mandatory sentences imposed by the legislature from a discretionary sentence imposed by a trial court that included a mandatory sentencing enhancement). Although the defendant challenges the distinction between mandatory and discretionary sentences, he supports this assertion with a case that involved a juvenile offender bringing an eighth amendment *Miller* challenge, not a proportionate penalties claim. See *Holman*, 2017 IL 120655 (in which defendant was 17 years old at the time of the offense and brought an eighth amendment claim pursuant to *Miller* on appeal). In light of the specific circumstances presented by the defendant's case, we find that the reasoning of *House* does not apply here. Thus, the defendant has failed to establish that his sentence violates the proportionate penalties clause as applied to him.

¶ 79    Moreover, even if this court were to assume that the defendant could establish that *Miller* applied to his sentence, where he committed felony murder at age 18, the record before us demonstrates that the trial court complied with *Miller* in sentencing the defendant. See *Holman*, 2017 IL 120655, ¶ 37 (finding that, pursuant to *Miller*, the court must consider a juvenile's "age and age-related characteristics and the nature of their crimes" in mitigation (internal quotation marks omitted)). Such age-related characteristics that a sentencing court should consider include defendant's (1) age at the time of the

offense and any evidence of his immaturity, impetuosity, or failure to appreciate risks and consequences; (2) family and home environment; (3) degree of participation in the offense and whether outside pressures may have affected him; (4) incompetence, inability to deal with law enforcement officers or prosecutors, and incapacity to assist his counsel; and (5) rehabilitative potential. *Id.* ¶ 46. A young-adult offender should be given an opportunity to present evidence indicating "that his criminal conduct was the product of immaturity and not incorrigibility." *Id.* ¶ 49.

¶ 80    At sentencing in this case, the trial court reviewed the PSI, Dr. Kosmicki's report, and the defendant's prior criminal conviction. The PSI and Dr. Kosmicki's report highlighted the defendant's young age when he murdered the victim as well as his persistent behavioral and learning issues in school and in his foster homes. The sentencing evidence also indicated that the defendant failed to take responsibility for his misconduct. The court indicated that it considered the defendant's intellectual disability as a mitigating factor, and it repeatedly noted the defendant's young age at the time of the crime, referring to the defendant and his codefendants as "kids" who would have been "riding bicycles" not long before the murder. The evidence also detailed the defendant's traumatic family history and that he spent several years in the foster care system. The court found the defendant's family history to be "tragic," and stated that based on "his home life, [he] never had a chance." There was evidence presented at trial as to the defendant's level of participation in the crime and that he brought the idea of robbing a taxicab to his codefendants' attention. Although there was evidence presented as to the defendant's intellectual disability, the PSI indicated that he finished high school prior to the murder and

31

often had good grades in school. The defendant had a history of criminal behavior, he had prior experience with law enforcement, he was found competent to stand trial, and there was no evidence presented that he was incapable of assisting his counsel. Finally, defense counsel argued that the defendant's sentence should be reduced based in part on his rehabilitative potential as well as his "[l]ow IQ and mental functioning." The court's comments during the sentencing hearing and the hearing on the motion to reduce sentence confirmed that it considered the defendant's youth, history, and intellectual ability in imposing the sentence. The court also stated that it was aware of the developing body of law relating to sentencing of "youthful offenders."

¶ 81    As shown, the defendant raised an as-applied constitutional challenge during the hearing on his motion to reduce sentence. The defendant's counsel specifically addressed *Miller* and its progeny and argued that the defendant's *de facto* life sentence of 45 years' imprisonment violated the eighth amendment and the proportionate penalties clause as applied to him. Further, the sentencing evidence included sufficient evidence regarding the defendant's youth, mental capacity, and other attendant circumstances. Given the sufficiently developed record before us, we find that the court adequately addressed the *Miller* factors in sentencing the defendant but ultimately found they did not warrant a lesser sentence given the seriousness of the offense and other aggravating factors.

¶ 82    Finally, the defendant asserts that his sentence is excessive where the trial court failed to give adequate weight to his potential for rehabilitation as evidenced by certain mitigating factors. Because the defendant's 45-year sentence was within the applicable sentencing range, it is presumptively valid. See *People v. Sauseda*, 2016 IL App (1st)

32

140134, ¶ 12 (similarly finding). We also presume that the trial court considered the mitigating evidence presented to it, absent evidence to the contrary. *Flores*, 404 Ill. App. 3d at 158. "The existence of mitigating factors does not mandate imposition of the minimum sentence [citation] or preclude imposition of the maximum sentence [citation]." *Id*. Further, a reviewing court is not permitted to reweigh the aggravating and mitigating factors considered by the sentencing court. *Id*.

¶ 83 With respect to the defendant's specific argument, we note that a defendant's rehabilitative potential is only one of the factors that should be considered by the trial court in sentencing a defendant. *Id*. at 159. The most important factor in sentencing, however, is the seriousness of the offense. *Id*. In rendering its sentence, the court is not required to explicitly outline its reasons for finding that defendant lacked rehabilitative potential. *Id*. "[T]he nature and circumstances of the offense and the history and character of the defendant will be the governing factors of rehabilitative potential." (Internal quotation marks omitted.) *Id*.

¶ 84 Upon reviewing the entire record of the defendant's sentencing hearing, it is clear the trial court weighed the appropriate aggravating and mitigating factors and decided an appropriate sentence in light of the seriousness of the offense. See *Abrams*, 2015 IL App (1st) 133746, ¶ 34 (the seriousness of the offense may outweigh the goal of rehabilitating defendant). Nevertheless, the defendant contends his sentence is excessive as the court "did not fully consider the extent to which [the defendant's] offense was the product of his youth, mental conditions, or that he was susceptible to peer pressure and sought peer approval." However, the record reflects that Dr. Kosmicki's report discussed at length the

33

defendant's mental conditions, the behavioral and learning issues he had throughout his life, as well as the various traumas he sustained as a child; defense counsel raised some of these issues in his argument at the sentencing hearing; and the matters were discussed in the PSI report. The court acknowledged the defendant's tragic circumstances, noted that he was only 18 years old, and referred to him and his codefendants as "kids" who would have been "riding bicycles" prior to the victim's murder. Therefore, there is no evidence in the record to rebut the presumption that the court considered these factors. See *Sauseda*, 2016 IL App (1st) 140134, ¶ 20 (similarly finding). As such, we presume the court considered them in fashioning the appropriate sentence for the defendant. See *id.*; see also *Flores*, 404 Ill. App. 3d at 158.

¶ 85                                III. CONCLUSION

¶ 86    For the foregoing reasons, the judgment of the circuit court of Jefferson County is hereby affirmed.


¶ 87    Affirmed.


¶ 88    JUSTICE WHARTON, specially concurring:

¶ 89    I concur with the majority in affirming the conviction and sentence. However, I write separately to express my concern with the admission of the copy of the jail communication letter attributed to the defendant.

¶ 90    At issue was a photocopy of a letter anonymously delivered on November 15, 2012, to a female resident at the jail—Stacy Ellis Garrison. Garrison did not know the defendant,

had never met the defendant, had never conversed with the defendant, and did not know his handwriting. The letter was slid under the door of her jail cell by an unknown individual. She testified that the letter could have been delivered to her by a fellow inmate assigned to perform tasks around the jail—a jail "trustee." The letter was signed by "Mark" from "E Block." The letter's author apologized and acknowledged his presence at the scene of a murder. The letter's author identified the shooter (a codefendant). Garrison did not believe that the letter was intended for her, and so she gave it to the jail authorities. The letter that was admitted into evidence at trial was a photocopy of the original letter because the original copy had been lost or destroyed.

¶ 91    I find that there was insufficient evidence of the letter's authenticity. First, the best evidence rule requires that for a party "[t]o prove the content of a writing ***, the original writing *** is required, except as otherwise provided in these rules or by statute." Ill. R. Evid. 1002 (eff. Jan. 1, 2011); see also *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 326 (1965). The Illinois Rules of Evidence allow the introduction of a duplicate writing unless "(1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Ill. R. Evid. 1003 (eff. Jan. 1, 2011). In addition, the rules allow the introduction of "evidence of the contents of a writing" if the original is lost or destroyed not due to the proponent's bad faith. Ill. R. Evid. 1004(1) (eff. Jan. 1, 2011).

¶ 92    Here, I believe that there were significant concerns about the authenticity of the original letter, and thus I believe that the trial court abused its discretion in allowing a duplicate copy of the purported original to be admitted into evidence. Ill. R. Evid. 1003(1).

Garrison's testimony did not establish that the defendant wrote the letter. Garrison did not know the defendant. She was unable to identify the defendant as the author of the letter and had no knowledge of any of the statements purportedly made by the defendant in this letter. Because she did not know the defendant, she could not provide evidence that the defendant was incarcerated in the same jail while she was incarcerated there. She also could not identify who delivered the letter under her cell door. Garrison's testimony only established that she found the original letter in her cell.

¶ 93 The State did not provide a handwriting analysis to establish that the defendant may have been the author. The majority cites *People v. Faircloth* for the proposition that proof of the defendant's handwriting was unnecessary for authentication if there was adequate circumstantial evidence establishing that the defendant was the author. *People v. Faircloth*, 234 Ill. App. 3d 386 (1992). After reviewing *People v. Faircloth*, I find that it is factually inapposite to this case. In *Faircloth*, the court concluded that there was "overwhelming" circumstantial evidence that the defendant was the author of the letters, even though the handwriting was not identified as that of the defendant. *Id.* at 392. The recipient of the letter could not identify the defendant's handwriting because she had never seen his handwriting before he was jailed. *Id.* at 391-92. However, while the defendant was in jail, the recipient and the defendant exchanged numerous letters. *Id.* at 392. Many of the letters were responsive to earlier letters. *Id.* In addition, the recipient and the defendant spoke on the telephone about the content of the letters. *Id.* The letters written by the defendant were signed by a name with which the recipient was familiar, and all contained his jail return address. *Id.* Finally, the letters contained factual details about the crime scene and events

36

leading up to the victim's cocaine-induced homicide. *Id.* These factual details tied the defendant to the letters because only he, the recipient of the letters, and the victim were present at the crime scene. *Id.* I find that *People v. Faircloth* is distinguishable because of both the specificity and connection of the circumstantial evidence to the defendant which made identification of his handwriting superfluous to authentication. In this case, I believe that the lack of handwriting identification was critical because the circumstantial evidence of authorship was not close to "overwhelming," and did not support authentication.

¶ 94    Of gravest concern was the timing of the delivery of the letter—18 months after the events at issue. By then, details of the crime were widely reported and, as the defendant argued, other inmates could have known the information contained in the letter. See, *e.g.*, DENISE HOLLINSHED, *Swansea Man, Three Others Charged in Death of Mount Vernon Cab* Driver, ST. LOUIS POST DISPATCH (June 1, 2011), http://www.stltoday.com/http s://www.stltoday.com/news/local/Illinois/Swansea-man-three-others-charged-in-death-of-mount-vernon-cab-driver/article_ce2a82d0-8c86-11e0-a54e-001a4bcf6878.html;   *Cab Driver    Shot    Dead;    Three    in*    Custody,    THE    SOUTHERN ILLINOISAN (May 31, 2011), https://thesouthern.com/news/local/crime-and-courts/cab-driver-shot-dead-three-in-custody/article_319ddeec-8bac-11e0-a43e-001cc4c03286.html; *4 Teens Charged with Murder after Cab Driver Found Shot, Killed*, KFVS12 (May 31, 2011, 12:54 PM; updated June 24, 2011, 5:33 AM), https://www.kfvs12.com/story/14753 713/mt-vernon-cab-driver-found-shot-and-killed/; COMMERCIAL   NEWS   (Danville) (May 31, 2011), https://obituaries.commercial-news.com/obituary-elllis-766756171.

Thus, any similarities between the letter and the facts of the case do not provide convincing evidence that the author must have had firsthand knowledge of these facts.

¶ 95   The letter was purportedly signed by a "Mark" from "E Block," and "Mark" is the defendant's first name. Further, all male inmates were housed in the "E Block." However, I find that these facts provide inadequate identification that the defendant was the letter's author. The majority cites to *People v. Munoz* as authority for admission of the letter, but I find that there are important distinctions between the two cases. The letter in *Munoz* was signed with the defendant's known nickname and contained his specific jail identification number and address. *Munoz*, 70 Ill. App. 3d 83-33. Furthermore, the recipient of the letter in *Munoz* was the defendant's girlfriend, who testified that she had previously received 20 to 30 other letters from the defendant signed with the same nickname and the same identifying cell number. *Id.* at 83-84. The author of the *Munoz* letter referred to a trip to Geneva, Illinois. *Id.* at 88. The court noted that only three people other than the defendant knew about this Geneva trip, and thus the list of possible letter authors was limited to four. *Id. Munoz* stood for the proposition that the State did not need to exclude every other possible author for the letter to be deemed sufficiently authenticated—that there was ample *prima facie* evidence that the defendant was the author. *Id.*

¶ 96   The circumstances surrounding the letter in this case did not provide any of the type of *prima facie* evidence relied upon by the *Munoz* court. All that was included in this letter was the first name that matched the defendant's first name and the cell block where all male inmates were housed. While the name "Mark" could be an identifying detail although

a fairly common name, the location source, "Block E," would not have been an authenticating detail because that block included the entire male population at the jail.

¶ 97    I acknowledge that the letter addressed some factual details connected to the murder. One of the victim's daughters was coincidentally named Stacy Ellis, and the State presented a theory that the purported note of apology delivered to the inmate Stacy Ellis Garrison (then known as Stacy Ellis) was intended for the victim's actual daughter. I find that knowledge of the name of Stacy Ellis is insufficient circumstantial evidence of authentication. In addition, the author of the letter indicated that the victim was shot and identified a codefendant as the shooter. These circumstantial facts could have been derived from any number of press reports of the crime and the charges, and/or from other inmates with unknown motivations in the jail environment who could have authored the letter. I do not find that the State presented a *prima facie* case warranting the authentication of the photocopy of the letter. Introduction of a letter into evidence during a murder trial, with uncertain identification and factual discrepancies, should require a more rigorous level of scrutiny in authentication before presentation to a jury.

¶ 98    For these reasons, I believe that the trial court should not have granted the State's request to allow the letter into evidence. However, the evidence implicating the defendant for the crime charged was overwhelming. Had the letter been excluded, I believe that the defendant would have been convicted anyway. Therefore, I find the error to be harmless beyond a reasonable doubt. See, *e.g.*, *People v. Spicer*, 379 Ill. App. 3d 441, 456 (2007) (quoting *People v. Stechly*, 225 Ill. 2d 246, 304 (2007)). Although I disagree with the trial

39

court's discretionary admission of the letter at issue, I concur with the majority's order with respect to the judgment and sentence.